**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:25-CR-0076 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE MATTHEW W. McFARLAND |
| vs. | : | |
| | : | |
| ROBERT GRIMMETT, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**SENTENCING MEMORANDUM**

Now comes Robert Grimmett, by and through counsel, and respectfully submits the following sentencing memorandum intended to assist this Court in determining a sentence that is sufficient but not greater than necessary. On October 8, 2025, Robert pled guilty to Count 1 of the Information, Production of Child Pornography, in front of Your Honor. This plea was made pursuant to Rule 11(c)(1)(A) with a statutory imprisonment range of 15 years to 30 years. Robert respectfully requests that this honorable court sentence him to 15 years (180-months) in the United States Bureau of Prisons.

**MEMORANDUM IN SUPPORT**

**I. Case Facts**

A cyber tip was received from The National Center for Missing and Exploited Children on May 28, 2025 regarding suspected child sexual abuse material transmitted over Kik. Within 24 hours, the material was located and the person posting was determined to be Robert Grimmett. Homeland Security agents immediately obtained a warrant and executed it on May 29, 2025.

1

Robert was located inside the home where the search warrant was executed and was immediately arrested. A total of 3 files were located, all uploaded between May 5, 2025 and May 18, 2025.

Robert immediately took responsibility for his actions. While still at his home, Robert admitted his behavior to the agents. He also waived his right to have a grand jury determine if the case should be indicted and entered a plea to the most severe count in the Information. He signed a plea agreement only 3 months after his arrest. His official plea of guilty in court occurred just 5 months after both the behavior that led to his arrest and his actual arrest.

Robert has been incarcerated since his arrest on May 29, 2025.

## II.    Facts about Robert

Robert is 25 years old. He was born and raised in the southeast corner of Ohio at the West Virginia border. He was born in Huntington, West Virginia and moved just a few miles away across the border to South Point, Ohio at the age of 14.

Robert's biological father was not involved in his life and died when he was 14 years old. His mother met his stepfather when Robert was two years old. His mother reports that she married his stepfather in the summer of 2005, when Robert was 4 years old.

It was also reported by his mother and grandmother that mother was in a relationship with a different man in the summer of 2005. It was reported that this man was a registered sex offender and was left to care for Robert and his sibling while his mother worked. No one was completely sure of what happened, but mother stated she returned home from work and there was a large red handprint on Robert's face. This man was arrested and children's services became involved. Grandmother has always been concerned that there was also sexual abuse occurring with Robert by this man. Grandmother reports that he was physically, verbally, and emotionally abusive towards Robert's mother as well. Forensic Evaluation. January 15, 2026. Pg. 5. PSR. Pg. 15, § 57.

Based on maternal grandmother's contacts, children's services never officially opened a case. They immediately placed the children with maternal grandmother. Grandmother reported that she only kept Robert in her home until the end of the summer. She reports she returned him to his mother's home as she was unable to continue to care for the children. Grandmother also stated that the case was on the news when it occurred. When addressing this topic with Robert, he told every professional that he had no recollection of this incident and was not made aware of this occurring until after his arrest in this case. Forensic Evaluation. January 15, 2026. Pg. 5 & 13. PSR. Pg. 15, § 57.

There are also allegations of abuse perpetrated by Robert's stepfather on his mother. While Robert reports not recalling visually witnessing any domestic violence, he did report hearing verbal violence which sounded physical at times. Robert's stepfather has also been extremely controlling since he became involved with Robert and his mother. An example of this is from when this case was initiated. Based on their assessment, Pre-Trial Services recommended that Robert be released from custody while awaiting trial, but required certain rules be implemented in the home he resided in. Robert requested to live with his parents, but his mother reported that his stepfather was unwilling to remove the firearms from the home during the timeframe he was in the home. It was clear in counsel's conversations with mother that she had no say in this matter, and that she was unable and/or unwilling to find housing without her husband, which would have allowed Robert to live with her.

Mother seemed to minimize concerns and history related to Robert's childhood development. Mother reported that Robert had an Individualized Education Plan ("IEP") while in school for speech. Additional questions revealed that Robert was provided a lot of extra services, including having tests read aloud to him. This is not a typical accommodation for a speech only

3

IEP. Defense Counsel's extensive knowledge about IEPs made her question the purpose for the IEP, since this extreme of an accommodation is a rare occurrence. Defense Counsel also had concerns based on initial discussions with Robert and concerns that pre-trial shared about his intellectual ability. This included Robert being unable to spell his middle name when requested to do so by pre-trial services. Following his plea hearing, defense counsel requested the federal court order a full mental health assessment be completed. This assessment included the doctor reviewing Robert's educational records. In 2012, when Robert was 11 years old, his IQ reflected a 70/68 based on the test. Forensic Evaluation. January 15, 2026. Pg. 5. Both are extremely low and made him eligible for services based on intellectual disability. However, no interventions began until 3 years later when he was in high school. Forensic Evaluation. January 15, 2026. Pg. 5. Robert's grandmother reported that his mother was on an IEP as well. It appears that Robert had significant childhood struggles, from both abuse and intellectual disability, that were not recognized or minimized by his parents. The records obtained show that Robert graduated from high school but mother reported that he "graduated by default." Forensic Evaluation. January 15, 2026. Pg. 5.

The mental health assessment done by the BOP as part of the Sentencing Report diagnoses Robert with "persistent depressive disorder with anxious distress, early onset, and other-specified personality disorder with mixed features (borderline and dependent)." Forensic Evaluation. January 15, 2026. Pg. 15. This is the first time that Robert has been assessed and diagnosed by a mental health provider. However, Robert reported suicidal ideations beginning around age 12. All of the individuals interviewed also reported anger issues which began in early childhood. His mother disclosed that this caused behavioral issues, which often impacted his schooling, and led to self-harming behavior. Specifically, Robert's mother reported that he would beat his own head on the floor and walls.

Robert has found no stability as an adult. Since turning 18, he has been unable to maintain steady employment and reports bouncing around between low paying jobs. His longest employment was with Taco Bell and lasted only 6 months. He married his childhood girlfriend and became a father, but housing has been ever changing and rarely independent. He and his wife have only lived outside of his parent's home for a few months before moving back in due to "poor and unhealthy conditions" of the apartment. Disagreements would occur and the young couple would move from place to place. Forensic Evaluation. January 15, 2026. Pg. 14. The home that Robert was living in and arrested at included him, his wife, their daughter, his mother, his step father, his grandfather, and his brother. No one in the home was employed. Robert reported to spending a significant amount of time alone in his room on the computer, gaming. He has never had to care for himself and has always been able to rely on other adults for his housing, money, and food.

## III.    The Minimum Sentence Achieves the Goals of Federal Sentencing

Federal sentencing is guided by the overarching principle that a Court impose a sentence that is "sufficient, but not greater than necessary" to achieve the overall goals of: reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, deterring future criminal conduct, protecting the public, and providing necessary rehabilitation. 18 U.S.C. § 3553(a)(2); Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558, 570 (2007). Matters such as age, education, mental or emotional condition, history of abuse, medical condition, employment history, lack of guidance as youth, family ties, or military, civic, charitable, or public service are "matters that § 3553(a) authorizes the sentencing judge to consider." Rita v. United States , 551 U.S. 338, 365 (2007) (Stevens, J., concurring) (citations omitted); accord United States v. Chase , 560 F.3d 828, 830-31 (8th Cir. 2009). The Supreme Court observed, "[i]t has been uniform and

constant in the federal judicial tradition for the sentencing judge to consider every person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States , 518 U.S. 81, 113 (1996). A sentence that focuses only on the offense and not the individual characteristics of the defendant or the other § 3553(a) factors is unreasonable. Olhovsky, 562 F. 3d at 549. Therefore, sentencing courts are charged with the duty to consider the specific characteristics of the defendant, as well as of the offense, in determining an appropriate sentence.

Research indicates that increases in the severity of punishment are far less important to producing deterrent effects than the certainty of punishment. See Wright, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment. Indeed, virtually no empirical data suggests that harsher (more lengthy) sentences achieve better general deterrence than moderate sentences. While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." Five Things About Deterrence, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

By pleading guilty, Robert has publicly acknowledged his wrongdoing and accepted responsibility for his actions. The life long consequences of being a felon and registered sex offender are severe on their own. Even after his incarceration, Robert will continue to be punished by having to reveal his sex offender status 4 times per year, potentially in multiple jurisdictions, for the rest of his life. A maximum sentence is not required to accomplish any of the factors listed in § 3553(a).

Robert has no history of any felony, sex related, or violent crime. He has been incarcerated for over a year. At one point he was moved to a BOP facility 3 states away to be able to complete

6

the mental health assessment ordered by this court as part of the PSR. No facility or representative of either the BOP or Butler County have reported any concerns related to his behavior or interactions with other inmates.

A term of 15 years for a first ever serious crime is more than enough time to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter future criminal conduct, and protect the public. A 15-year sentence for a 25 year old means his sentence will be the length of 3/5 of his entire life so far. This also gives more than enough time to rehabilitate Robert. He will be able to get the mental health treatment that he has needed for his entire life, along with life skills to be able to be independent and successful upon his release. His daughters will also both be in their upper teens upon his release, which will allow him to assist in parenting. Robert has never seen or been taught appropriate life skills or coping techniques. The BOP will teach these to him, and he will in turn be able to teach his children as they transition into adulthood.

## IV.  Robert's Age and Trauma History Should Be Given Significant Weight.

Part 5 of the United States Sentencing Commission's Guidelines Manual is a portion of the guidelines used to determine the appropriate sentence for a defendant. Section H of this Part discussed Specific Offender Characteristics that were required to be taken into account when determining the appropriate sentence.  Section H was removed effective November 1, 2025, but it still provides a discussion of specific characteristics that can be taken into account during sentencing. Our inclusion of this no longer used guideline is not in an attempt to change the guidelines provided by the PSR. It is simply to give additional background in a format previously used to determine if any adjustments can be made to the time remaining for Robert.

    a.  §5H1.1 Age

Age may be relevant in determining whether a departure is warranted.

Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

United States Sentencing Commission, Guidelines Manual, §5H1.1 (Nov. 2024) (Deleted effective November 1, 2025).

Robert's life has made him uniquely vulnerable. He is 25 years old. However, his history of trauma in childhood and adverse experiences makes his functioning lower than that of a typical person in their mid 20s. "Trauma, especially when it happens in childhood, can pause certain aspects of emotional development at the age the trauma occurred." *Why Do I Feel Younger Than My Age? Trauma Explained,* https://scienceinsights.org/why-do-i-feel-younger-than-my-age-trauma-explained/, ScienceInsights. (March 9, 2026).

The Forensic Evaluation completed by The U.S. Department of Justice, Federal Bureau of Prisons, assessed Robert's current IQ and found "nearly all measured areas reflect abilities within the Below Average to Very Low ranges when compared to the general population." Forensic Evaluation. January 15, 2026. Pg. 15. While interacting with Robert, it quickly becomes clear that he does not have the same knowledge or maturity as other 25-year-old men. In addition, Robert reported never having obtained a driver's license and relying on others for all transportation. *Id*, pg. 6. He reported to a "longstanding reliance on others" and difficulty making

8

everyday decisions independently. *Id*, pg. 16. He also reported "longstanding and significant deficits in personal hygiene" and often requiring reminders to complete basic hygiene. *Id*, pg. 12.

Robert's only prior criminal involvement was a conviction for misdemeanor theft. The doctor performing the Forensic Evaluation concluded that this type of crime, along with his reported anger issues, suggests "impulse control difficulties" and "impaired judgment" rather than "callousness or an antisocial orientation." *Id*, pg. 10. This is also shown in the facts of this crime. The behavior occurred while an unknown female was texting and encouraging these acts be performed. This does not lessen the seriousness of the behavior, but it does provide some explanation for his behavior.

## V. Conclusion

Robert Grimmett respectfully requests that this court sentence him to 180-months in the United States Bureau of Prisons, less time served.

Respectfully submitted,

KARA C. BLACKNEY, # 0085940
Blackney Law, LLC
35 East Seventh Street, Suite 201
Cincinnati, OH 45202
(513) 381-8115
Kara@BlackneyLaw.com
*Attorney for Robert Grimmett*

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via this Court's electronic filing system on all counsel of record on this the 18th of July, 2026.

KARA C. BLACKNEY, # 0085940

ATTACHMENTS:

1 – Letter of Support – Emily Grimmett (wife)

2 – Letter of Support – Josette Craven (mother)

*Letter from Robert Grimmett will be provided upon receipt from USPS.

10

 Gmail

Kara Blackney <kara@blackneylaw.com>

---

## this is kara

---

**Emily Grimmett** <emilygrimmett8@gmail.com>
To: Kara Blackney <kara@blackneylaw.com>

Tue, Jun 16, 2026 at 12:18 PM

[Quoted text hidden]

Your honor

Im the child mother and Robert is my husband I'm speaking on behalf of him and my daughter. Today is July 29th one of the days that is going to break my heart on both ends because my daughter will lose her father for a long time and I'm going to be losing the man I married the man i grew up with I'm standing in the court room today because my husband made a decision that wasn't my fault Robert is a good person he just allows these thoughts get into his head he allows the angry to build up he has never done something like this he was such a great father to our child he played with her she would set on his lap and play the video game with him he watched her everyday so I can work because becoming a cna was my dream something I wanted to do my dream. I always wanted to help other who needed it and now I'm not able to go back to my job due to the fact I got to raise to little girls and knowing my daughter will not have her father for a very long time breaks me it's like I'm not going to win here all this put me in situation where I gotta protect my daughter and also watch the man I love be put away for a long time my child is going to grow up with out her dad she's not going to know who he is and every inch of my body screams for help because of the trauma the pain I have been through everyday I set there and suffer everyday wondering if me and my children are going to be safe alone knowing I don't have support I had support when he was not in jail he was helping support our daughter he bought diapers he bought wipes formula clothes mainly everything he provided when I was pregnant and even after I had our child he still provided up until I wanted to go to work and follow my dreams we had conversations we had arguments we had all of the above but we still provided for our child but out of everything he mainly did the providing more than me now that I don't have any support yes there might be ways through the assistance of having food stamps ktap which ktap is basically cash assistance that isn't enough for bills diapers wipes food it doesn't help with early head start assisting school clothes shoes or even activities for Emma I'm not wanting him to pay anything because that's not how I want things to be if I could go back in time and fix everything I would but that's not how it works I'm asking if he can see his child why he goes to prison and if he is allowed to have contact when he gets out I'm not asking for forgiveness because I can't condone what he done because he made his choice.

Sincerely Emily Grimmett

Attachment
A

 **Gmail**

Kara Blackney <kara@blackneylaw.com>

## Re: letter 4 robbie

1 message

**scoobyjoss69@aol.com** <scoobyjoss69@aol.com>                    Fri, Jul 10, 2026 at 1:53 PM
Reply-To: "scoobyjoss69@aol.com" <scoobyjoss69@aol.com>
To: kara@blackneylaw.com

July 9, 2026

Your Honor,

I'm writing this letter to you as a loving mom on behalf of my son Robert Grimmett. I first want to say that when this happened the whole family was(still is especially me and his wife) in complete shock of everything. I'm not condoning of what he did, but I would like o hive you s little background about Robbie and his upbringing.

Robert was born a good size healthy baby weighing in at 7lbs 15oz. 21in. After he was born when he was about 1 years old him and his brother would go to Rhode Island every summer and visit my mom and step-dad. My parents would take them to Six Flags, parks, pools, boat rides out to eat shop. They even went to Walt Disney World.

When Robbie was in school he had IEP's for his speech. When he was in school he was able to make friends real easily. Robbie liked to play football so we had him on a football team. Also while he was in school even though he was making friends easily he would help other kids that were getting picked on by bullies. Robbie has always put others first and made sure they were ok before he was. He graduated from a technology school in Auto Body in 2020.

Robbie and his wife had a child in 2023. She was his whole world and would do anything for his child. When she would wake up or if she was sick he would feed her give her medicine or anything else he needed to do for his child no matter how tired he was. His daughter Emma had her wrapped around his finger as soon as she was born. He was so happy that he was a dad.
When Robert and Emily got
together, he was working entire time they were living at home. Robert has always been thoughtful, caring and even still continue to work while she could stay home while she was pregnant. When Robert found out he was going to be a dad I never seen him so happy as I had seen him that day.

I know and understand that Robert
will be doing his time and has to register when he gets out, but I believe people should get second chances. I know deep inside his heart he does have a conscious and is ashamed and embarrassed of what he has done. So as painful this is for me, if there is anyway you can help him with the situation he has gotten himself into that would be most pleasant

Sent from AOL on Android

*Attachment*

*B*